CARLAND, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 18745-82.                Filed March 30, 1988.

*J. Glenn Hahn, David E. Bass, David N. Zimmerman*, and *George D. Halper*, for the petitioner.
*James F. Kidd* and *James Cannon*, for the respondent.

## OPINION

DRENNEN, *Judge*: This case was assigned for trial or other disposition to Special Trial Judge James M. Gussis pursuant to section 7456(d) (redesignated section 7443A(b) by section 1556 of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2755) and Rule 180 et seq.[1] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below.

### OPINION OF THE SPECIAL TRIAL JUDGE

GUSSIS, *Special Trial Judge*: Respondent determined the following deficiencies in petitioner's Federal income taxes:

|  | Income tax |
| --- | --- |
| *TYE Dec. 31—* | *deficiency* |
| 1970 | $24,623.61 |
| 1971 | 41,798.86 |

---

[1] All section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise provided.

| TYE Dec. 31— | Income tax deficiency |
|---|---|
| 1972 | $25,139.98 |
| 1973 | 107,820.04 |
| 1974 | 41,581.77 |
| 1975 | 27,818.78 |

Petitioner filed an amendment to petition on August 28, 1985, raising certain alternative positions and on September 16, 1985, respondent filed an answer to the amendment to petition in which he determined increases in petitioner's income tax deficiencies for the years 1970 through 1975 as follows:

| Year | Original deficiency | Increase | New deficiency |
|---|---|---|---|
| 1970 | $24,623.61 | $866,710 | $891,334 |
| 1971 | 41,798.86 | 574,652 | 616,451 |
| 1972 | 25,139.98 | 289,158 | 314,298 |
| 1973 | 107,820.04 | (27,737) | 80,083 |
| 1974 | 41,581.77 | 141,992 | 183,574 |
| 1975 | 27,818.78 | 56,750 | 84,569 |

The issues are (1) whether petitioner is entitled to use the income-forecast method in computing a reasonable allowance for depreciation under the provisions of section 167 with respect to any class of its leased equipment in the taxable years ended December 31, 1970 through 1975; (2) whether petitioner is entitled to use the income-forecast method of depreciation in conjunction with appropriately assigned salvage values with respect to any class of its leased equipment; and (3) in the alternative, the determination of the average useful lives of the various classes of leased equipment to be used to compute a reasonable allowance for depreciation under section 167(b).

### FINDINGS OF FACT

Some of the facts have been stipulated and they are herein incorporated by this reference.

Carland, Inc., hereinafter referred to as "Carland" or "petitioner," was incorporated on or about January 14, 1964, under the laws of the State of Delaware. Carland's principal office during the years 1970 through 1975, was in Kansas City, Missouri. During the years 1970 through 1975,

Carland's outstanding 100 shares of common stock, with a par value of $100, were owned by Veals, Inc. (75 shares), and M.T. (Bud) Marqua (25 shares). Veals, Inc., was a member of the Kansas City Southern Industries, Inc. (hereinafter Industries), consolidated group. During the years in issue, Carland was the parent of a consolidated group which included Taxpediters, Inc. (taxable year 1970), and Trans-Serve, Inc. (taxable years 1970 through 1975). Carland, an accrual basis taxpayer, filed its consolidated corporation income tax return for the taxable years 1970 through 1975 with the Internal Revenue Service, Kansas City, Missouri.

During the years 1964 through 1975, Carland was engaged in the activity of leasing various categories of tangible personal property which included railroad rolling stock, automotive equipment, railway roadway maintenance, aviation, communication, and other miscellaneous equipment. Substantially all of Carland's leases for railroad equipment were 5-year primary terms with three 1-year renewal options. Substantially all of petitioner's leases for automotive equipment were 3 year primary terms with five 1-year renewal options.

During the years 1970 through 1975, Carland entered into certain lease agreements with the following corporations (hereinafter the related lessees) which at all times here relevant were members of Industries' consolidated group:

American-Coleman Co ............................(American-Coleman)
Carthage Cablevision, Inc  .........................(Carthage)
Lindgren & White Construction Co  ................(Lindgren)
Mid-America T.V., Inc  ...........................(Mid-America TV)
North Baton Rouge Development Co ...............(NBRD)
Systec Data Management, Inc .....................(Systec)
Trapp's, Inc  ....................................(Trapp's)

During the years 1970 through 1975, Carland entered into certain lease agreements with the following corporations (hereinafter the unrelated lessees) which were not at any time here relevant members of the Industries or Carland consolidated group:

Oliver Advertising, Inc.............................(Oliver)
Servitron, Inc .....................................(Servitron)
Trans-Mark, Inc ...................................(Trans-Mark)
Comet Industries, Inc..............................(Comet)

E. J. Cook Co. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .(Cook)
Gulf Oil Co., U.S., a division of Gulf Oil Corp . . . . . . . .(Gulf)
Jamestown Saw Mill Co . . . . . . . . . . . . . . . . . . . . . . . . . . .(Jamestown)
Smith Brothers Contracting . . . . . . . . . . . . . . . . . . . . . . .(Smith Bros.)
Mid-America Export-Import Marketing & Consulting
   Co . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .(Memco)

During the years 1964 through 1969, Kansas City Southern Railway Co. (Railway) entered into 11 lease agreements with Carland relating to certain rolling stock, auto racks, automotive, communication, roadway maintenance, aviation, and other equipment. During the years 1964 through 1969, Louisiana & Arkansas Railway Co. (L&A) entered into 31 lease agreements with Carland relating to certain rolling stock, auto-racks, and locomotive engines, and automotive, communication, roadway maintenance, aviation, electronic data processing, and other equipment. During the years 1964 through 1969, NBRD and Lindgren each entered into a lease agreement with Carland relating to certain automotive equipment. During the years 1964 through 1969, Carthage entered into a lease agreement with Carland relating to certain communication equipment. During the years 1964 through 1969, Systec entered into 4 lease agreements with Carland relating to office furniture and equipment and certain automotive equipment. During the years 1964 through 1969, Trapp's entered into a lease agreement relating to office furniture and equipment.

The lease agreements entered into by Carland with related lessees in the years 1964 through 1969 generally contained substantially similar terms and provisions which, except for minor modifications, were incorporated into the lease agreements in later years. The 15 lease agreements entered into by Carland with Railway, L&A, and NBRD in 1964 contained, inter alia, the following provisions: (a) Designation of primary and renewal lease terms; (b) designation of rentals; (c) the manner in which the lessee is to instruct the lessor with respect to specific items of equipment required by the lessee; (d) lessee's duty to return the equipment in the same condition in which it was received by the lessee, ordinary wear and tear excepted; (e) lessee's obligation to pay rentals not relieved by destruction or damage to the equipment; (f) lessee's duty to maintain and repair the equipment at all

times (with the exception of the 1964 lease agreement with Railway which imposed this duty on the lessor); (g) lessee's duty to pay all license and registration fees, taxes, assessments, and charges on the equipment and the lessor's right to reimbursement for all said amounts paid by lessor on lessee's behalf; (h) lessee's indemnification of the lessor from all claims and liabilities arising from lessee's use of the equipment; (i) lessor's right to be advised as to the location of the equipment and lessor's right to inspect the equipment; (j) lessor's right to treat lessee as purchaser of the equipment for purposes of the investment tax credit; (k) express agreement that the transaction is a lease only, and nothing therein shall be construed as conveying any right, title, or interest in said equipment other than as a lessee. The 22 lease agreements entered into between Carland, as lessor, and Railway and L&A, as lessees, during the taxable years 1965 through 1969, contained terms and conditions substantially identical to those listed above except for the following: (1) Lessee's assumption of all risks of loss or damage to the equipment and lessee's duty to notify lessor of any substantial damage; (2) upon destruction of a unit, lessee is to pay lessor an amount equal to the unamortized value of such unit at time of payment; (3) lessee's duty to pay all costs, expenses, fees, and charges incurred in connection with the use of the equipment; (4) an agreement that replacement parts and accessories added to the equipment by the lessee shall become property of the lessor unless the same can be disconnected from the equipment without impairing the function of said equipment; (5) the express agreement that the lessee is under no duty to order any of the equipment; and (6) lessor's right to assign the lease.

The 12 lease agreements entered into during 1967, 1968, and 1969 between Carland, as lessor, and L&A, Carthage, Lindgren, Systec, and Trapp's, as lessees, contained terms and conditions substantially identical to the leases specified in the above paragraph, except for the following: (1) Requirement that, except when alterations or improvements are recommended by the manufacturer, lessee will obtain lessor's written consent prior to making any alterations or improvements to the leased equipment; (2) designation of

the location of the equipment during the term of the lease; (3) prohibition of the lessee from assigning the lease without the written consent of the lessor; (4) definition of default; (5) lessee's requirement to ship the equipment, at lessee's expense, to a location designated by the lessor upon any termination of the lease; and (6) the omission of any passthrough of the investment tax credit to the lessee. The Systec automotive lease contained an option to purchase the subject automobile exercisable by the lessee at the end of 36 months for $500.

During the years 1964 through 1969, Carland entered into lease agreements with Paul C. Vescovo, Jr. (1 lease—office furnishings), Oliver (4 leases—automotive equipment and certain office furniture and equipment), Comet (17 leases— automotive equipment), Servitron (7 leases—automotive and roadway maintenance equipment), Trans-Mark (2 leases— office furniture and equipment), Gulf (1 lease—rolling stock). These lease agreements (except for the Gulf lease) contained terms and conditions generally similar to the leases described above. The lease agreement with Gulf during the year 1969 contained, inter alia, the following provisions: (1) Lessee's responsibility for all operating costs incurred in the use of the equipment; (2) lessee's duty to return the equipment in as good a condition as when received by lessee, ordinary wear and tear excepted; (3) loss of equipment does not relieve lessee of its obligation to pay rentals; (4) lessee's indemnification of lessor from all liabilities and claims arising from the use of the equipment; (5) provisions relating to default; (6) lessee's duty to pay all taxes on the equipment; (7) lessor retains title to leased equipment, and (8) option to purchase leased freight cars under designated terms.

On or about November 1, 1965, Carland acquired the interest of Choctaw Leasing, Inc. (hereinafter Choctaw), a Delaware corporation which was not a member of Industries' or Carland's consolidated group, in 4 leases between Choctaw, as lessor, and L&A, as lessee, relating to certain rolling stock and roadway maintenance equipment and Choctaw's interest in 2 leases between Choctaw, as lessor, and Railway, as lessee, relating to certain rolling stock and auto racks. The Choctaw leases included, inter alia, the

following provisions: (1) Lessee's responsibility for all operating costs incurred in connection with the use of the equipment; (2) lessee's duty to return the equipment in as good a condition as when received by lessee, ordinary wear and tear excepted; (3) lessee's indemnification of lessor from all liabilities and claims arising from the use of the equipment; (4) provisions relating to default; (5) lessee's duty to pay all taxes on the equipment; (6) lessor's agreement to treat the lessee as the purchaser of the equipment for purposes of the investment tax credit; and (7) agreement that title to the equipment remains in the lessor and prohibition of lessee from mortgaging, pledging, or encumbering said equipment. None of the Choctaw leases contained provisions extending to lessees an option to purchase the leased equipment. The freight cars and equipment acquired by petitioner in the assignment of the Choctaw leases had been rebuilt in the early 1960's by Darby Corp.

During the years 1970 through 1975, Carland entered into the following lease agreements: (1) 7 lease agreements with Railway relating to locomotive engines, roadway maintenance, automotive, and other equipment; (2) 22 lease agreements with L&A relating to rolling stock, roadway maintenance, automotive, communications, and other equipment; (3) 8 lease agreements with Trapp's relating to certain automotive and other equipment; (4) 5 lease agreements with Industries relating to certain roadway maintenance and automotive equipment; (5) 3 lease agreements with Mid-America TV relating to certain communications equipment; (6) 2 lease agreements with American-Coleman relating to certain roadway maintenance and communications equipment; (7) 3 lease agreements with Systec relating to certain automotive equipment; (8) 47 lease agreements with Comet relating to certain automotive, communications, and other equipment; (9) 26 lease agreements with Servitron relating to certain automotive, roadway maintenance, communications, and other equipment; (10) 3 lease agreements with Memco relating to certain automotive and other equipment; (11) 2 lease agreements with Cook relating to certain automotive equipment; and (12) a lease agreement with Gulf relating to certain rolling stock.

Generally, the terms and provisions of the lease agreements entered into by Carland during the years 1970 through 1975 were similar to the terms and conditions in the lease agreements executed during the years 1964 through 1969. While variations in the lease agreements entered into during the years 1970 through 1975 existed, such variations reflected terms and conditions existing in some of the lease agreements entered into in the years 1964 through 1969.

On or about May 1, 1970, Railway (lessee) entered into a lease with Vineyard Car Corp. (lessor) for the lease of 6 locomotives, 2 cabooses, and 75 gondola cars for a 15-year term. The lease also provided for 5-year renewal terms at the expiration of the original term with respect to the gondola cars and the cabooses. At the conclusion of the renewal terms, the items of equipment either had to be returned to the lessor or purchased at the then fair market value. In November 1974, Railway offered to rent 65 of the above gondolas to Canadian National Railway for $9.56 per day plus $0.0407 per mile.

A financial lease is a lease which allows the lessor to recover his total cost of the property subject to the lease over the primary term of the lease, plus provide some rate of return or rate of interest on his investment. An operating lease does not allow the lessor to recover his cost during the term of the lease. Financial leases were commonly used by business and industry in the period 1970 through 1975. The term "internal rate of return" is the rate that a lender would receive, assuming compounding of any interim funds that are received throughout a given period. The term "effective annual rate of interest" involves calculating the true rate of return on an annual basis, assuming compounding of any interim fund flows.

Dr. Jack E. Gaumnitz (hereinafter Gaumnitz), professor of finance at the University of Kansas, prepared a report entitled "Analysis of Financial Leases, Kansas City Southern Railway Co., Carland, Inc., and Third Party Lessors," which was a comparative analysis of an "External Lease" between Exchange National Bank of Chicago, as lessor, and Railway, as lessee, with an "Internal Lease" between Carland, as lessor, and Railway, as lessee. The "External

Lease" analysis was based upon a lease of railroad equipment dated September 15, 1975, between Exchange National Bank of Chicago, as lessor, and Railway, as lessee. The provisions of the lease and the assumptions necessary to complete the analysis were as follows: (1) The lessor retains the investment tax credit; (2) the lessor makes a 28-percent downpayment at closing of the conditional sales contract with vendor (General Motors); (3) the entire cost of the asset is financed on lease to lessee; (4) lessor is guaranteed a 20-percent salvage value at termination of primary term of lease; (5) lease is an absolute net lease with lessee paying all operating expenses; (6) primary lease runs for 15 years with semiannual payments sufficient to amortize the amount over time; (7) lessee has two 5-year renewable periods at its option with lease rate in option period to be at a fair market rental; (8) lessor depreciates the property over a 12-year period using accelerated depreciation: double-declining-balance with switch to sum-of-years-digit method if beneficial and in accordance with the class life asset depreciation range in effect at the time; (9) lessee agrees not to engage in any acts that would in any way jeopardize the rights of the lessor under these arrangements; and (10) the rate charged to the lessee generally reflects the costs of financing, plus a spread (in the analysis the rate is 10½ percent paid semiannually at the rate of 5.11 percent). Gaumnitz determined that the effective annual rate of return to the lessor, Exchange National Bank, under the lease and assumptions outlined above was 9.75 percent.

Gaumnitz also made an "Internal Lease" analysis based upon a January 24, 1968, lease between Carland, lessor, and L&A, lessee. The assumptions with respect to this analysis varied from those in the preceding paragraph in the following respects: (1) The investment tax credit is passed to the lessee; (2) the purchase cost of the asset, less an initial down-payment, is financed through a bank or other financial institutions; (3) no salvage value is guaranteed to the lessor at the end of the primary lease period; (4) the asset will be depreciated under the income-forecast method; (5) the primary lease runs for 5 years or 3 years (in this case the primary lease is 5 years); annual renewal options for up

to 3 years or 5 years are available at minimal rents, usually about 1 percent of the original cost; (6) the lessor requires a 6-percent net return (3 percent after tax) on the rental income; and (7) financing costs charged by lessor to lessee amount to 6 percent (discount basis) of the total investment cost plus interest. Gaumnitz determined that the effective annual rate of return to the lessor (Carland) under the lease and the assumptions outlined above was 15.11 percent.

An interest rate spread is the difference between the interest rate an institution might receive on its loans and the interest rate it must pay for its funds. The interest rate spread between the annual percentage rate realized by Carland under the Internal Lease (14.16 percent) and Carland's cost of borrowing (10.69 percent) was 3.47 percent. The interest rate spreads between the loan rates and the time deposit rates for commercial banks for the years 1969 and 1975 were 3.50 percent and 3.47 percent, respectively. The interest rate spreads between the loan rates and the weighted time deposit and demand deposit rates for commercial banks in 1969 and 1975 were 5.49 percent and 5.25 percent, respectively. Carland determined the rental charges on its leased equipment to yield a 3-percent net return, after taxes, taking into account the interest rates in effect when money was borrowed to finance the purchase of the assets involved.

At all times during the terms of the leases between Carland and Railway, L&A, and others, legal title to the equipment subject to said leases was in Carland. None of the leases between Carland and Railway or L&A contained options to purchase. Under the provisions of the Carland leases, the lessee had the option to renew the lease after the primary term had expired. The 5-year leases contained three 1-year renewal options while the 3-year leases contained five 1-year renewal options. The Carland leases did not contain guaranteed value clauses to guarantee to the lessor a specific stated value at the end of the lease term. Petitioner retired damaged or destroyed assets from its books when it ultimately disposed of such equipment.

Petitioner depreciated its leased equipment for income tax purposes and for financial statement purposes under the income-forecast method of depreciation. Under this method,

petitioner determined annual depreciation for each leased asset by multiplying the original acquisition cost to petitioner of the asset by a fraction which had as a numerator the rental income accrued by petitioner with respect to the asset for the taxable year, and, as a denominator, the total rental income expected from the asset over the primary and renewal period of the lease covering said asset.

Carland determined rental obligations on its leases without regard to the nature of the underlying leased property. Rentals extending beyond the 8-year terms of the leases were at the renewal rates stated in the leases.

The general classifications of the tangible personal property owned and leased by petitioner during the years in issue are as follows:

|  | Class number (computer code) |
|---|---|
| A. Transportation equipment | |
|    1. Passenger autos | [1]110, 119 |
|    2. Light trucks — under 1 ton | 120, 129 |
|    3. Medium trucks — 1 to 2 tons | 130 |
|    4. Heavy trucks — over 2 tons | 140, 149 |
|    5. Trailers, vans, flatbeds | 150 |
| B. Rolling stock | |
|    1. Rolling stock, complete units | 210, 219 |
|    2. Components, traction motors | 220 |
|    3. Components, engines | 230 |
|    4. Components, generators | 240, 249 |
|    5. Components, auto-racks | [2]250 |
|    6. Components, other (rolling stock) | 260 |
| C. Maintenance-of-way equipment | |
|    1. Cranes — large | 310 |
|    2. Cranes — small | 320 |
|    3. Ballast working machines | 330 |
|    4. Other equipment | 340, 349 |
| D. Data processing | 400 |
| E. Other equipment | 500, 509 |
| F. Aircraft and components | 510, 519 |

[1]Code classification numbers ending in "9" indicate equipment previously under lease which was remanufactured or rebuilt and then leased under a new lease agreement.

[2]The auto-racks owned and leased by petitioner during the years in issue appear in two different categories, i.e., either in class 210 (rolling stock, complete units) or in class 250 (components, auto-racks).

The above general classes of equipment consisted of the following specific types of equipment:

*Transportation equipment*:
Passenger autos: sedans and station wagons
Light trucks: pickup trucks, ½- and ¾-ton trucks
Medium trucks: 1-ton and 1½-ton trucks, buses
Heavy trucks: 2-ton and 2½-ton trucks and tractor trucks
Trailers, vans and flatbeds: trailmobile flatbed trailers, platform trailers, drop-frame trailers, and vans

*Rolling stock*:
Complete units: boxcars, flatcars, hopper cars, gondolas, coaches, dining and lounge cars, business cars, cabooses, and locomotives
Components — traction motors: remanufactured locomotive traction motors
Components — engines: remanufactured locomotive engines
Components — generators: locomotive generators
Components — auto-racks: bilevel and trilevel auto-rack frames
Components — other: alternator kits

*Maintenance-of-Way equipment*:
Cranes — large: tie-handler cranes, hoist cranes, link-belt cranes
Cranes — small: rail truck cranes, burro cranes
Ballast working machines: tampers, ballast regulators, tie removers, ballast router, and tie hydrenewers
Other equipment: spike drivers, pullers and setters, tie handlers, plus setters and spacers, drills, track wrenches, bolt cutters, jacks, mowers, welding units, ballast cleaners, rail lifters, weld mowers, pushcars, tie spacers, rail saws, high-pressure pumps, scarifiers, and trackliners

*Aircraft and components*: aircraft, aircraft engines and parts, ground service units, aircraft radios, instruments and navigational aids

*Data processing equipment*: central processing units, key punch terminals, printers, memory units, modems, automatic car identification (ACI) scanner systems, and related railcar wheel sensors

*Other equipment*: office furniture and equipment, cameras and recorders, communications equipment, generators, compressors, faultfinders, forklifts, camp trailers, backhoes, tractors, graders, and pushcarts.

As of January 1, 1970, petitioner owned transportation equipment with original acquisition costs to petitioner and accumulated depreciation as of that date in the following amounts:

| Class | Acquisition costs | Accumulated depreciation |
|---|---|---|
| 110, 119 | $234,555.24 | $124,397.33 |
| 120, 129 | 402,848.26 | 227,742.32 |

| Class | Acquisition costs | Accumulated depreciation |
|---|---|---|
| 130 | $282,799.36 | $102,076.81 |
| 140 | 1,743,000.68 | 977,005.73 |
| 150 | 725,781.47 | 720,705.31 |

During the years 1970 through 1975, petitioner purchased and placed in service the following transportation equipment:

| Year | 110/119 | 120/129 | 130 | 140/149 | 150 |
|---|---|---|---|---|---|
| 1970 | $60,634.56 | $19,245.89 | - - - | - - - | - - - |
| 1971 | 105,511.18 | 10,316.15 | $16,053.47 | $37,795.90 | - - - |
| 1972 | 141,742.02 | 43,967.14 | 165,125.24 | 402,951.46 | - - - |
| 1973 | 142,454.54 | 264,907.15 | 79,739.21 | 39,333.98 | $7,939 |
| 1974 | 120,660.26 | 33,988.61 | - - - | 140,331.46 | - - - |
| 1975 | 46,610.62 | 16,237.74 | - - - | 206,836.34 | - - - |

All items of transportation equipment listed above (except items in classes 119, 129, and 149) were acquired by petitioner, and the original use thereof commenced with petitioner during the year of acquisition and commenced after December 31, 1953.

During the period 1964 through 1984, petitioner realized the following amounts on the retirement of transportation equipment acquired prior to 1976:

| Class | Salvage proceeds | Acquisition costs | Percent of salvage proceeds to original acquisition costs |
|---|---|---|---|
| Passenger autos | $103,630.66 | $825,351.34 | 12.16% |
| Light trucks | 54,841.11 | 849,154.24 | 6.46 |
| Medium trucks | 38,219.74 | 533,866.27 | 7.16 |
| Heavy trucks | 202,910.43 | 1,702,920.00 | 11.92 |
| Trailers, vans, flatbeds | 195,066.39 | 655,593.39 | 29.75 |

During the period 1964 through 1984, significant increases in the price level and inflation occurred in the economy generally which affected the manufacturing costs and selling prices of the various types of tangible personal property purchased and leased by petitioner.

As of January 1, 1970, petitioner owned rolling stock equipment with original acquisition costs and accumulated depreciation as of that date in the following amounts:

| Class | Acquisition costs | Accumulated depreciation |
|---|---|---|
| 210, 219 | $5,418,332.76 | $3,641,000.66 |
| 220 | 30,247.52 | 16,127.98 |
| 230 | 1,271,373.08 | 523,657.99 |
| 240, 249 | 135,400.00 | 19,861.65 |
| 250 | 260,856.72 | 246,805.40 |
| 260 | 21,997.75 | 21,744.51 |

During the years 1970 through 1975, petitioner acquired and placed in service the following rolling stock equipment:

| | Class of equipment | | | |
|---|---|---|---|---|
| Year | 210/219 | 230 | 240/249 | 250 |
| 1970 | $467,936.04 | $231,426.92 | - - - | $89,210 |
| 1971 | 179,345.70 | 93,861.70 | $3,372.42 | - - - |
| 1972 | 107,752.40 | - - - | - - - | - - - |
| 1973 | 907,789.94 | 72,871.61 | 22,541.70 | - - - |
| 1974 | 86,006.00 | - - - | - - - | - - - |
| 1975 | - - - | 202,126.53 | - - - | - - - |

During the years 1970 through 1975, George T. Cook Co., a scrap metal broker, acquired freight cars (including boxcars, gondola cars, and hopper cars) from Carland and sold them to steel mills and foundries as scrap. The sales price received by the broker was based on the salvageable scrap steel from the freight cars. Moveable freight cars were shipped over rail lines directly to the steel mill or foundry, with freight expenses paid by the broker. Damaged freight cars were dismantled and cut up and loaded on freight cars for delivery to the steel mill or foundry, with the dismantling and shipping expenses paid by the broker. During the years 1970 through 1975, the scrap metal broker paid Carland the amount received for the freight cars sold as scrap less its commission and any expenses paid by the broker for the preparation of the freight cars for delivery to the steel mill or foundry.

Railway and L&A discontinued passenger train service in 1969 and at that time the passenger cars leased by Railway and L&A from Carland became obsolete and the salvage value of such passenger cars was equivalent to their scrap price. The expected salvage of a slug locomotive (a locomotive equipped only with traction motors and electric switching gear) at the end of its useful life is the value of its salvageable steel and copper. The salvage value of freight cars and locomotive engines at the end of their useful life is the value of their salvageable scrap steel.

During the period 1964 through 1984, petitioner realized, on the retirement of rolling stock equipment acquired by it prior to 1976, the following amounts of salvage proceeds:

| Class | Salvage proceeds | Original acquisition costs | Percentage of salvage proceeds to original acquisition costs |
|---|---|---|---|
| Rolling stock, complete units | $623,999.63 | $4,058,653.25 | 15.37% |
| Components, traction motors | 7,500.00 | 29,247.52 | 25.64 |
| Components, engines | 11,750.00 | 179,928.09 | 6.53 |
| Components, generators | 8,617.42 | 111,234.32 | 7.75 |
| Components, auto-racks | 12,469.56 | 123,221.57 | 10.12 |
| Components, other (rolling stock) | 1,000.00 | 21,997.25 | 4.55 |

As of January 1, 1970, petitioner owned maintenance-of-way equipment with original acquisition costs and accumulated depreciation as of that date in the following amounts:

| Class | Acquisition costs | Accumulated depreciation |
|---|---|---|
| 310 | $178,028.30 | $58,292.15 |
| 320 | 207,234.45 | 180,080.58 |
| 330 | 650,799.30 | 378,137.85 |
| 340, 349 | 521,826.37 | 255,773.78 |

During the years 1970 through 1975, petitioner acquired and placed in service the following maintenance-of-way equipment:

| Year | Class of equipment | | | |
|---|---|---|---|---|
| | 310 | 320 | 330 | 340/349 |
| 1970 | - - - | - - - | $1,450.00 | $28,138.75 |
| 1971 | - - - | - - - | 42,687.00 | 239,671.06 |
| 1972 | $28,017 | - - - | - - - | 209,057.62 |
| 1973 | - - - | - - - | 119,390.02 | 130,902.27 |
| 1974 | 15,000 | $103,306.20 | 231,400.41 | 364,856.37 |
| 1975 | - - - | - - - | 267,179.19 | - - - |

During the years 1970 through 1975, George T. Cook Co. acquired various items of maintenance-of-way equipment from Carland. Such items were picked up along rail lines where they had been discarded, or from a salvage yard in Shreveport, Louisiana, and were accumulated until a sufficient amount of such equipment was collected to justify shipment to a steel mill or foundry for sale, at which time such equipment was cut up and loaded on freight cars for shipment to the purchaser. Steel mills and foundries purchased such salvage equipment only in carload lots of 100,000 pounds or more. Salvage maintenance-of-way equip-

ment was sold to steel mills and foundries on the basis of the weight of the salvageable scrap steel. The scrap metal broker paid Carland the amount received for the scrap steel salvaged from the maintenance-of-way equipment less commissions, preparation charges, and freight.

During the years 1964 through 1975, the scrap metal broker acquired no working or serviceable maintenance-of-way equipment from Carland. The maintenance-of-way equipment leased to Railway, L&A, and Servitron was in poor condition at the end of the lease terms. During the years 1970 through 1975, only a limited market existed for used maintenance-of-way equipment, resulting in a decreased salvage value for said equipment.

During the years 1964 through 1984, petitioner realized the following amounts of salvage proceeds from the retirement of maintenance-of-way equipment:

| Class | Salvage proceeds | Original acquisition costs | Percent of salvage proceeds to original acquisition costs |
| --- | --- | --- | --- |
| Cranes — large | $5,667.00 | $110,610.65 | 5.12% |
| Cranes — small | - - - | - - - | - - - |
| Ballast working machines | 78,927.89 | 905,480.92 | 8.72 |
| Other equipment | 60,161.44 | 859,303.58 | 7.00 |

As of January 1, 1970, petitioner owned certain data processing equipment (class 400) with original acquisition costs of $2,905,707.72 and accumulated depreciation of $1,454,917.04. During the years 1970 through 1975, petitioner purchased and placed in service the following data processing equipment:

| Year | Acquisition costs |
| --- | --- |
| 1970 | $447,751.37 |
| 1971 | 62,347.15 |
| 1972 | 471,224.00 |
| 1973 | 115,052.44 |
| 1974 | 97,527.01 |
| 1975 | - - - |

In 1972, petitioner leased to Railway and L&A certain electronic devices which collectively comprised an automatic car identification system (ACI) which was designed to identify and locate rolling stock. The components of the ACI system included rail-mounted wheel sensors, electronic scanners, and computers. Due to a variety of factors the ACI

system did not function properly and was removed from service within 2 or 3 years after its initial installation.

During the years 1966 through 1975, Carland leased various types of data processing equipment to Railway and L&A. The data processing equipment consisted of mainframe computers, core memory units, cathode ray tubes, printers, control units, modem equipment, and telecommunications equipment. Said equipment was used by Railway and L&A to maintain their accounting and freight car location systems.

During the years 1966 through 1975, frequent technological changes occurred in the computer industry. The salvage value of data processing equipment leased by Carland was affected by such technological developments which could make the equipment obsolete. The cost of the newer technology also had an effect on the salvage value of the data processing equipment. During the years 1964 through 1984, petitioner realized the following amounts of salvage proceeds on the retirement of data equipment:

| Class | Salvage proceeds | Original acquisition cost | Percent of salvage proceeds to original acquisition cost |
|---|---|---|---|
| Data processing | $597,627.21 | $3,918,771 | 15.25% |

As of January 1, 1970, petitioner owned aircraft and components and other equipment with acquisition costs and accumulated depreciation as follows:

| Class | Acquisition costs | Accumulated depreciation |
|---|---|---|
| Other equipment | $824,964.14 | $510,688.07 |
| Aircraft and components | 340,482.40 | 154,910.51 |

During the years 1970 through 1975, petitioner purchased and placed in service the following classes of other equipment (classes 500, 509):

| Year | Acquisition costs |
|---|---|
| 1970 | $422,108.34 |
| 1971 | 203,204.67 |
| 1972 | 400,146.99 |
| 1973 | 494,027.43 |
| 1974 | 45,065.73 |
| 1975 | 75,309.46 |

During the years in issue, Carland leased the following types of two-way radio equipment to Railway and L&A: (1) Locomotive radio, (2) mobile radio, (3) base station, and (4) hand-held radio. During the years in issue, Carland leased computerized electronic scales to Railway and L&A. Said scales were rail-mounted and were used to weigh rolling stock and other items of equipment using railroad rail.

During the period 1964 through 1984, petitioner realized the following amounts of salvage proceeds on the retirement of aircraft and components and other equipment:

| Class | Salvage proceeds | Original acquisition costs | Percent of salvage proceeds to original acquisition costs |
|---|---|---|---|
| Aircraft and components | $420,214.48 | $774,769.75 | 54.24% |
| Other equipment | 171,432.18 | 1,219,622.00 | 14.06 |

The principal users of transportation equipment under lease from Carland during the years in issue were Railway, L&A, Servitron, and Comet. Vehicles leased from Carland by Railway and L&A were in use on a daily basis in remote areas and a major portion of their use was on unpaved roads. Such vehicles were ordinarily in poor condition when returned to Carland.

During the years 1970 through 1975, the maintenance-of-way division of Servitron supervised the engineering and maintenance-of-way operations of Railway and L&A. The construction division of Servitron built railroad tracks, bridges, signaling devices, and similar railroad installations for Railway and L&A. During the years 1970 through 1975, Servitron leased from Carland automobiles, pickup trucks, light trucks, and heavy trucks. Such vehicles were utilized primarily to transport workers and equipment to various jobsites.

The principal business of Kansas City Southern Transport Co. (hereinafter Transport), a wholly owned subsidiary of Railway, was to operate all rail terminals of Railway and L&A which have trailer-on-flatcar and container-on-flatcar operations, to pick up and deliver trailer loads of freight at all terminals for Railway and L&A, and to oversee the dispatching of trailers over the entire rail system and

perform mechanical work on all rubber tire rolling stock used by Railway and L&A. During the years 1970 through 1975, Transport operated an average of 5 automobiles, 8 pickup trucks, 50 truck tractors, 80 vans, and 20 flatbed trailers, all of which were leased from Carland. The estimated useful life of passenger vehicles, station wagons, and pickup trucks used by Transport during the year 1970 through 1975 was 5 years.

The vans leased from Carland were boxed trailers typically 40 to 45 feet long with a total capacity of 2,400 to 2,700 cubic feet and were generally used to haul general commodities such as foodstuffs, refrigerators, and other appliances. The vans leased from Carland were part of the National Railroad Trailer Pool and subject to interchange agreements between Railway and L&A and other railroads and various other contract truck operators. Under the interchange agreements, vans which were part of the National Railroad Trailer Pool were free-running items of equipment and were subject to return to their owner only once a year for specific purposes.

A rebuilt freight car is a freight car which has been repaired or remanufactured with the utilization of some used parts and functions as a new freight car. Remanufactured rolling stock has a shorter life than new rolling stock. Most of the rolling stock leased by Carland to Railway and L&A was used or remanufactured. The various types of freight cars were used for the following categories of freight: (1) Boxcar—paper, packaged products, and some sack products; (2) open-top hopper—sand, gravel, coal, coke, and petroleum products; (3) covered hopper—grain, flour, sugar, or any bulk material requiring protection from the elements; (4) gondola—coal, gravel, sand, coke, and machinery; (5) flatcar—pipe, machinery, pressure vessels, poles, and square tanks.

Freight cars used to transport petroleum or coke (an end product in the petroleum refining process with a high sulfur content) have shorter useful lives because of (1) the manner in which coke is loaded into such freight cars, and (2) the corrosive effect of the sulfuric acid created when the coke is mixed with water in the loading process.

During the years 1970 through 1975, Railway and L&A had 511 freight cars under lease from Carland in the following categories: 80 boxcars, 154 open-top hopper cars, 61 covered hopper cars, 88 gondolas, 8 flatcars, 40 special use freight cars, 9 passenger cars, 7 locomotives, 10 cabooses, and 54 auto-racks. The 511 freight cars included 56 new freight cars and 455 remanufactured freight cars.

Auto-racks, described as flat cars with frames built on them, are designed to carry wheeled vehicles and may consist of two or three levels. Auto-rack design is subject to changes and modifications mandated by changing specifications required by automobile manufacturers. During the years in issue, petitioner leased some 143 auto-racks to Railway and L&A, which included 54 auto-racks classified as class 210—rolling stock, complete units, and 89 classified as class 250—auto racks. The class 210 designation encompasses complete rolling stock units, i.e., auto-rack and underlying flatcar are both under lease. The class 250 designation encompasses auto-rack frames, alone, and does not include the underlying flatcar.

During the years 1970 through 1975, Railway and L&A leased six slug locomotives from Carland. The slug locomotives had been rebuilt by Darby Corp. using former switch engine underframes and trucks and remanufactured traction motors. Railway and L&A also leased remanufactured locomotive engines from Carland during the years in issue. The principal supplier of remanufactured locomotive engines in the railroad industry was the Electro-Motive Division of General Motors (EMD). Consistent with the general practice in the railroad industry, EMD maintained a pool of remanufactured locomotive engines. A customer who experienced locomotive failure received an immediate replacement from the pool, turning in the failed engine to the pool where it was then remanufactured to pool standards. The cost to the customer of the rebuilt engine which he received from the pool was the cost of rebuilding his failed engine to pool standards.

In its annual report to the Interstate Commerce Commission for 1970, Railway listed 19 equipment purchases payable in installments over terms lasting from 8 to 15 years. The equipment involved in the 19 equipment-

purchase agreements consisted predominantly of freight cars and locomotives. In 1973, Railway incurred a 15-year obligation with respect to the purchase of 300 freight cars and a 5½-year obligation with respect to the purchase of 330 freight cars. In 1974 Railway incurred a 15-year obligation with respect to the purchase of 20 locomotives. On or about March 1, 1971, Railway leased 22 locomotives from United States Trust Co. of New York (trustee-lessor) for a 15-year term. The March 1, 1971, lease did not provide for a renewal option but it did provide for a purchase option for a price measured by the fair market value of the locomotives at the end of the lease. As of September 1, 1971, Railway leased 285 hopper cars from Pullman Transport Leasing Co. for terms ranging from 6 months (for 25 of the hopper cars leased) to 10 years (for 250 of the hopper cars leased). The lease with Pullman Transport Leasing Co. did not provide for a renewal option.

On April 3, 1972, Railway leased 100 new covered hopper cars for a term of 15 years from United States Railway Leasing Co. The lease did not provide for a renewal option. On or about February 1, 1976, Railway leased 10 covered hopper cars for a 6-year term from Pullman Leasing Co. The lease did not provide for a renewal option. On March 1, 1977, Railway leased 450 boxcars from Manufacturers National Bank of Detroit for a 15-year term. The lease provided for renewals of three additional 2-year periods at the then-prevailing fair market rental. As of September 23, 1981, Railway leased 299 used boxcars from Rex Railway, Inc., for a 15-year term, with a right in the lessee to terminate the lease after 5 years. The lease indicated the possibility of needed major repairs to some of the boxcars prior to acceptance by the lessee. The lease also provided an option to purchase (for $1 per car) at the end of the 15-year lease term. On February 25, 1982, Railway leased 205 used boxcars from Rex Railways, Inc., for a 15-year term with an option in lessee to purchase any of the cars for $1 per car at the end of the lease term. On or about September 15, 1975, Railway entered into a lease with Exchange National Bank of Chicago (trustee) for 4 locomotives for a 15-year term. The semiannual rental for each of the locomotives was 5.11 percent of the designated purchase price. The lease provided

for renewal for two additional 5-year periods at a rental geared to the then-prevailing fair market value of the leased equipment. The lease also provided that the lessor intended to retain the units for re-lease at the expiration of the lease term.

Railroad industry practices with respect to remanufactured generators were substantially the same as those with respect to remanufactured locomotive engines. The principal supplier of remanufactured generators was also the Electro-Motive Division of General Motors.

All items of maintenance-of-way equipment (including classes 310, 320, 330, and 340, but not including class 349 or certain remanufactured items) were acquired by petitioner and the original use thereof commenced with petitioner during the taxable year of acquisition and commenced after December 31, 1953. During the years in issue Servitron, Railway, and L&A leased maintenance-of-way equipment from Carland.

All items of data processing equipment (class 400) were acquired by petitioner and the original use thereof commenced with petitioner during the taxable year of such acquisition and commenced after December 31, 1953. During the period from 1966 through 1975, the useful life of data processing equipment leased by Carland was affected by technological developments that made such equipment obsolete and by the cost of newer equipment that incorporated such technological developments.

All items of aircraft and components (class 510) and other equipment (class 500), except certain items in these categories designated as remanufactured, were acquired by petitioner and the original use thereof commenced with petitioner during the taxable year of acquisition and commenced after December 31, 1953.

The following schedule indicates the total assets acquired by petitioner and leased for the period 1964-75 and the assets retired by petitioner for the period 1964-84:

| Class No.— | Description | Total units purchased 1964-75 | Total cost of additions 1964-75 | Number of retirements 1964-84 |
|---|---|---|---|---|
| 110 | Passenger automobiles | 209 | $896,024.81 | 95 |
| 119 | Passenger automobiles | 1 | 1,054.50 | 0 |
| 120 | Trucks (light-duty) | 162 | 896,024.81 | 66 |

| Class No.— | Description | Total units purchased 1964-75 | Total cost of additions 1964-75 | Number of retirements 1964-84 |
|---|---|---|---|---|
| 129 | Trucks (light-duty) | 1 | $2,490.68 | 1 |
| 130 | Trucks (medium-duty) | 94 | 660,904.73 | 23 |
| 140 | Trucks (heavy-duty) | 173 | 2,617,417.62 | 51 |
| 149 | Trucks (heavy-duty) | 4 | 8,335.00 | 0 |
| 150 | Trailers, flatbeds, etc. | 102 | 739,236.47 | 82 |
| 210 | Complete rolling stock units | 544 | 7,360,390.30 | 246 |
| 219 | Complete rolling stock units | 6 | 47,873.81 | 0 |
| 220 | Traction motors | 12 | 30,247.52 | 0 |
| 230 | Engines | 70 | 1,871,413.35 | 5 |
| 240 | Alternators and generators | 19 | 155,002.22 | 0 |
| 249 | Alternators and generators | 5 | 6,311.90 | 0 |
| 250 | Auto racks | 89 | 350,066.72 | 1 |
| 260 | Other rolling stock components | 40 | 21,997.25 | 0 |
| 310 | Small cranes | 13 | 221,045.30 | 0 |
| 320 | Large cranes | 7 | 310,540.65 | 0 |
| 329 | Large cranes | N/A | N/A | |
| 330 | Ballast work machines | 49 | 1,312,907.92 | 2 |
| 340 | Other maintenance-of-way equipment | 181 | 1,492,702.44 | 3 |
| 349 | Other maintenance-of-way equipment | 1 | 1,750.00 | 0 |
| 400 | Data processing | 334 | 4,099,612.06 | N/A |
| 500 | Railroad maintenance | 282 | 1,357,214.18 | 7 |
| 500 | Furniture and fixtures | 118 | 896,949.93 | 20 |
| 500 | Communications systems | 412 | 235,278.06 | 1 |
| 509 | Communications—furniture and fixtures | 1 | 1,152.50 | 0 |
| 510 | Aircraft and components | 19 | 750,109.75 | 19 |
| 519 | Aircraft and components | 6 | 24,660.00 | 6 |

Railroad rolling stock was retired by petitioner during the period 1964 through 1974 for a variety of reasons, i.e., a number of cars were wrecked and (together with other cars) were sold for scrap, a few cars were retired when petitioner withdrew from the passenger service business during this period, and in one instance, an unrelated third-party lessee (Gulf Oil Co.) exercised its lease option to acquire forty 5-year-old hopper cars in July 1974.

Rule 107 of the Association of American Railroads Interchange Rules, which was in effect throughout the years in issue, governed payments to member railroads when cars belonging to them were damaged or destroyed while operated over the lines of other railroads. At all times relevant, Railway and L&A were both members of the Association of

American Railroads. Pursuant to rule 107 the damages with respect to a destroyed car are based upon the year and month that the car was originally built or rebuilt with no distinction made between new cars and rebuilt cars.

If a car leased by Railway from Carland was totally wrecked during the term of the lease, then the terms of the governing lease obligated Railway to pay Carland an amount equal to the unamortized value of the unit at the time of payment. Upon such payment, title to the unit and any insurance thereon would pass to the lessee.

Douglas H. Cormier, a professional industrial appraiser employed by Valtec Associates, Inc. (hereinafter Valtec), prepared a report entitled "Useful Life Analysis of Certain Assets of Carland, Inc." Life analysis is a method of determining the expected useful life of various assets. There are two general methods of life analysis, the turnover method and the actuarial method. The actuarial method is a detailed analysis of the actual historical data on asset activity and considers among other factors the age of assets at the date of retirement and it has long been used to determine the average useful life of many types of industrial and business properties. The actuarial method of life analysis requires information concerning the additions per year (new assets), the retirements per year (assets terminating their relationship), the dates when such additions and retirements occur within the experience band (the time period under study), and the vintages of the assets (the number of years an item under study has continued the relationship). The actuarial approach is based on the premise that historical life characteristics of a group can be used to predict future life expectancy. The actuarial method consists of five steps: (1) Collection of data; (2) development of exposure and retirement table; (3) calculation of cumulative percent surviving; (4) curve fitting; and (5) determination of useful life. In step 1 (collection of data), the start and termination dates of assets retired within each experience band and the start dates of all assets that have not been retired as of the study date are collected from historical asset sources. In step 2, which involves the development of an exposure and retirement table from the collected data, age intervals are determined and survivors

and retirements within each age interval are reflected in tables. Step 3 involves the calculation of the cumulative percent surviving. The cumulative percent surviving shows the probability of an asset remaining for any given number of years. The cumulative percent surviving is calculated as follows: (1) Total retired divided by total survivors equals percent retired; (2) the percent remaining times the percent surviving at beginning of year equals the percent surviving for the next year. Step 4 in the actuarial method is extending the curve representing the data collected where the property under study does not reach zero percent surviving, i.e., not all of the assets have been retired at the date of the study. Since the computation of service life of a group of assets is determined by computing the area under a completed survivor curve, the stub survivor curve must be extended to zero percent surviving. Stub survivor curves can be extended to zero percent surviving by (1) freehand extension, (2) a visual fitting of type curves to the original data curve, or (3) fitting mathematically standard curves to the existing stub survivor curve.

Charles Carroll is vice president of the consulting firm, G.W. Fauth & Associates, specializing in transportation economics. Mr. Carroll is an Interstate Commerce Commission (ICC) class B practitioner (i.e., a non-lawyer certified to practice before the ICC) and a member of several transportation associations including the Association of Rate of Return Analysts. Mr. Carroll analyzed the economic useful life of railroad equipment generally based on the actual experience of Railway, L&A, and upon the Interstate Commerce Commission's industry-wide calculations of life expectancies and salvage values of railroad cars and equipment. Mr. Carroll relied upon detailed data submitted to the ICC by major railroads relating to their operating and financial history. The majority of such historical data is submitted by a railroad in an annual report to the Interstate Commerce Commission (generally referred to as an R-1). Upon consideration of data filed with the ICC by Railway and L&A with respect to the appropriate depreciation charges for their railroad equipment, the ICC ordered that, effective with the accounts for January 1979, Railway and L&A could apply annual composite percentage rates

reflecting the following service lives for the designated equipment:

| Account No.— | Equipment | Service years | Salvage |
|---|---|---|---|
| 52 | Locomotives: | | |
| | Diesel road | 22 | 10% |
| | Diesel switch | 33 | 10 |
| 53 | Freight-train cars: | | |
| | Plain boxcars—40 ft. | 20.5 | 23 |
| | Plain boxcars—50 ft. and larger | 20.5 | 17 |
| | Equipped boxcars | 18 | 17 |
| | Plain gondola cars | 15.5 | 23 |
| | Covered hopper cars | 21 | 23 |
| | Open-top hopper cars—general service | 12.5 | 21 |
| | Open-top hopper cars—special service | 23 | 18 |
| 53 | Refrigerator cars— nonmechanical | 23 | 20 |
| | Flatcars—TOFC/COFC | 29 | 18 |
| | Flatcars—general service | 32 | 24 |
| | Flatcars—other | 32 | 18 |
| | All other freight cars (excluding cabooses) | 23 | 22 |
| | Cabooses | 23 | 10 |

Richard P. Hoffman is vice president of fleet management and administration of the Pullman Leasing Co. He began his employment with Pullman Leasing Co. in 1977 after some 16 years in various aspects of the railroad industry. His background also includes a period as State director of railroads for the State of Iowa and as a research leader in the National Research Project on Track Train Dynamics. Mr. Hoffman's duties with Pullman Leasing Co. are to direct the operations of the company with special emphasis in the areas of car repair operations and management. Mr. Hoffman's duties with Pullman Leasing Co. in 1977 involved the renegotiation and renewal of leases entered into by his employer in prior years.

Pullman Leasing Co. was formed in late 1959 to provide financial alternatives to customers who traditionally purchased railroad cars from Pullman Standard Railcar Co. Pullman Leasing Co. is the sixth largest private railcar company in the United States. The company owned some 25,000 railroad cars, including approximately 14,000 hopper cars, 4,000 larger capacity cars used generally for the

petro-chemical industry, 1,000 boxcars, about 2,500 tank cars, and some 2,000 coal cars. Pullman Leasing Co. primarily leases cars manufactured by its sister company, Pullman Standard Manufacturing Co. Pullman Leasing Co. has also added second-hand railroad cars to its rental fleet. Pullman Leasing Co. continually added railroad cars to its fleet throughout the 1970's.

The leases generally entered into by Pullman Leasing Co. involve both new equipment and used equipment. New equipment was leased over terms of 10, 12, or 15 years after which, in the event the lessee no longer wanted the equipment, Pullman Leasing Co. would endeavor to lease the equipment to others. Pullman Leasing Co. leases of freight cars generally were for terms of 5, 10, 12, and, in some instances, 20 years. Assuming normal wear and tear and normal maintenance, it is not unusual for a freight car to last 20 years.

Valtec Associates, Inc. (Valtec), prepared an original study and a supplemental study based upon machine-readable computerized data base magnetic tapes supplied to Valtec for purposes of the studies. The schedule on page 533 summarizes the experience band reflected in both studies.

Neither of the Valtec studies assigned lives to the Carland assets in the following categories:

| Asset class description | Description | Reasons |
|---|---|---|
| 119 | Passenger automobiles | Inactivity — no data |
| 159 | Trailers, flatbeds, etc. | Inactivity — no data |
| 319 | Small cranes | Inactivity — no data |
| 329 | Large cranes | Inactivity — no data |
| 122 | Not identified | Inactivity — no data |
| 100 | Not identified | Insufficient retirement data |
| 149 | Trucks (heavy-duty) | Insufficient retirement data |
| 219 | Complete rolling stock units | Insufficient retirement data |
| 220 | Traction motors | Insufficient retirement data |
| 240 | Alternators and generators | Insufficient retirement data |
| 260 | Other rolling stock components | Insufficient retirement data |
| 310 | Small cranes | Insufficient retirement data |
| 349 | Other | Insufficient retirement data |
| 509 | Communication, furniture, and fixtures | Insufficient retirement data |
| 230 | Engines | Insufficient retirement data |

| Asset class description | Description | Reasons |
|---|---|---|
| 250 | Auto-racks | Insufficient retirement data |
| 330 | Ballast work machines | Insufficient retirement data |
| 129 | Trucks (light duty) | 100% retired — 3 years |
| 519 | Aircraft and components | 100% retired — 1 year |
| 500 | Communication, furniture, and fixtures | Component equipment not traced |

Under date of November 7, 1983, a consolidated depreciation study of railroad rolling stock (equipment accounts 52 and 53, i.e., locomotives and freight cars) for Railway and L&A through the year 1981 was submitted to the ICC. Under date of May 21, 1985, another consolidated depreciation study of railroad rolling stock for Railway and L&A through the year 1984 was submitted to the ICC. The studies were prepared by Railway and L&A for the purpose of obtaining approval of the ICC for proposed depreciation rate changes. The studies covered a 30-year experience band including historical data showing the average age of retirement of railroad rolling stock for the years in issue.

The cover letter of the May 21, 1985, depreciation study contains the following explanation of the actuarial method employed in making the study:

This study was conducted using our aged equipment data files processed through the Deliotte, Haskins & Sells computerized depreciation study package. Aged data by sub-account was run through an actuarial program which provided data points for plotting survivor curves. The survivor curves were then generated by computer but were manually fitted to Iowa curves. A 30-year experience band was analyzed and included all types of installations as well as all types of retirements in all cases. Salvage value of $60.00 per ton for scrap was provided by our mechanical department and converted to a percentage of original cost by sub-account. Data on TOFC and multi-level flat cars (sub-accounts .11 and .12) was insufficient to accurately conduct a study on each type individually. Likewise, data on equipped gondolas (sub-account .05) was also insufficient. Therefore, data for all types of flat cars (sub-accounts .11 through .14) was accumulated as a composite group as was data for all types of gondolas (sub-accounts .04 and .05). These two composite groups were then processed through the actuarial program and the rate calculation program to yield an annual depreciation rate to apply to all sub-accounts in the group.

The book depreciation reserve by sub-account as of December 31, 1984, as well as the Iowa Curve type, average service life and salvage percent for each sub-account were then run through our computer rate calculation programs to yield a theoretical reserve, average remaining life, rate and

| Experience band (life in years) | Passenger cars 110 | Light trucks 120 | Medium trucks 130 | Heavy trucks 140 | Truck trailers 150 | Rolling stock 210 | Maintenance-of-way equipment 340 | Data processing 400 | Aircraft and components 510 |
|---|---|---|---|---|---|---|---|---|---|
| (1) 1964-1969 | | | | | | | | | |
| Ex. 52 | 8.50 | 4.75 | N/A | N/A | N/A | 9.50 | Not lifed | N/A | 2.50 |
| Ex. 53 | 9.00 | 5.00 | N/A | N/A | N/A | 9.50 | N/A | N/A | 2.50 |
| (2) 1964-1970 | | | | | | | | | |
| Ex. 52 | 5.00 | 5.25 | N/A | 6.00 | 8.75 | 13.00 | Not lifed | 6.00 | 2.50 |
| Ex. 53 | 4.75 | 6.00 | N/A | 6.00 | 7.50 | 13.50 | N/A | 6.00 | 2.50 |
| (3) 1964-1971 | | | | | | | | | |
| Ex. 52 | 4.75 | 6.00 | 6.50 | 7.00 | 9.25 | 8.75 | Not lifed | 5.25 | 3.25 |
| Ex. 53 | 4.25 | 6.50 | 6.50 | 7.00 | 9.00 | 8.25 | 9.00 | 5.25 | 3.25 |
| (4) 1964-1972 | | | | | | | | | |
| Ex. 52 | 4.50 | 6.50 | 6.75 | 7.75 | 12.50 | 10.00 | Not lifed | 8.00 | 3.75 |
| Ex. 53 | 4.00 | 6.50 | 6.75 | 7.75 | 10.75 | 9.25 | 13.25 | 8.00 | 3.75 |
| (5) 1964-1973 | | | | | | | | | |
| Ex. 52 | 4.25 | 6.50 | 7.25 | 8.50 | 10.75 | 12.75 | Not lifed | 6.50 | 4.00 |
| Ex. 53 | 4.00 | 6.75 | 7.25 | 8.50 | 10.50 | 9.25 | 13.75 | 6.50 | 4.00 |
| (6) 1964-1974 | | | | | | | | | |
| Ex. 52 | 4.00 | 6.50 | 7.50 | 8.75 | 9.00 | 11.25 | Not lifed | 7.25 | 4.00 |
| Ex. 53 | 4.00 | 6.50 | 7.50 | 8.75 | 8.75 | 10.50 | 11.75 | 4.00 | 4.00 |

N/A = Not available.

accrual for each sub-account. The rate calculation program used incorporates the Straight-Line method, Average Life Group Procedure and the Remaining Life Technique.

We would like to point out that in our study of 40 ft. boxcars (53.01) we have arbitrarily lowered the service life, in recognition of obsolescence, from 18 years (as figured per the Iowa Curve type) to 14 years. * * *

The same actuarial method was employed in making the earlier depreciation rate study which was submitted to the ICC under date of November 7, 1983. Both depreciation studies were prepared from a data base of aged history files of Railway for equipment accounts 52 and 53 (locomotives and freight cars). The information in the data base came from Railway's books and records and was recorded contemporaneously with the addition or retirement of an item of equipment.

Equipment accounts 52 and 53 covered by the depreciation studies contain the following sub-accounts:

| Sub-account No.— | Description |
| --- | --- |
| 52.01 | Locomotives — yard |
| 52.02 | Locomotives — road |
| 53.01 | Boxcars — plain 40 ft. |
| 53.02 | Boxcars — plain 50 ft. and longer |
| 53.03 | Boxcars — equipped |
| 53.04 | Gondolas — plain |
| 53.05 | Gondolas — equipped |
| 53.06 | Hopper — covered |
| 53.07 | Hopper — open-top — general service |
| 53.08 | Hopper — open-top — special service |
| 53.09 | Refrigerator — nonmechanical |
| 53.11 | Flat — TOFC/COFC |
| 53.12 | Flat — multilevel |
| 53.13 | Flat — general service |
| 53.14 | Flat — other |
| 53.15 | All other cars |
| 53.16 | Cabooses |

Carland's leased railroad rolling stock would fall into the following ICC sub-account classifications:

| Description | Sub-account No.— |
| --- | --- |
| Boxcars — 40 ft. — steel | 53.01 |
| Boxcars — 70 ton — steel | 53.02 |
| Boxcars — 70 ton, 80½ ft | 53.02 |
| Gondolas, plain | 53.04 |
| Gondolas, equipped | 53.05 |

| Description | Sub-account No.— |
|---|---|
| Hoppers, covered | 53.06 |
| Hoppers, woodchip | 53.08 |
| Hoppers, 70 ton, open-top, chip | 53.08 |
| Flatcars | 53.12 |
| | 53.13 |
| | 53.14 |
| Auto-racks | 53.12 |
| Airslide cars | 53.15 |
| Ballast cars | 53.15 |
| Insulated boxcars, 50 ft | 53.15 |
| Insulated boxcars | 53.15 |

In the May 21, 1985, depreciation study for 1984, a reconciliation of the study to Railway's annual report to the ICC (R-1) was necessary due to the fact that Carland-owned equipment was a part of the total Railway equipment report in the R-1.

The May 21, 1985, depreciation study included the following data compilation schedules:

1. Average age of retirement by retirement year;
2. Survivors and retirements by vintage year;
3. Band analysis survivor report 1955-84;
4. Average life group method theoretical reserve;
5. Average life group method limited remaining life.

The study also included summaries of the average life group-method accounts and remaining life rates.

Based upon information derived from historical data, a stub curve was plotted by a Railway employee (and incorporated in the depreciation studies) showing actual retirements of the various items of Railway. An appropriate Iowa curve (from among 30 possible Iowa curves) was then selected and manually applied to the curve.[2] The average service life of each sub-account of railroad equipment was determined by matching Railway's stub curve to an Iowa curve. Based upon Railway's depreciation rate study of its railroad rolling stock as of December 31, 1981, the average life and matching Iowa curve was as follows:

---

[2] The methodology involved in the use of the Iowa curve in the determination of the useful lives of assets is described in *Chesapeake & Ohio Railway Co. v. Commissioner*, 64 T.C. 352, 372-375 (1975).

| Class | Description | Average service life (years) | Iowa curve |
|-------|-------------|------------------------------|------------|
| 52.01 | Locomotives — yard | 36 | R3 |
| 52.02 | Locomotives — road | 24 | L3 |
| 53.01 | Boxcars — plain 40 ft. | 18 | L3 |
| 53.02 | Boxcars — plain 50 ft. and longer | 17 | S1 |
| 53.03 | Boxcars — equipped | 15.5 | L3 |
| 53.06 | Hopper cars — covered | 22 | R3 |
| 53.07 | Hopper cars — open top general service | 13 | L4 |
| 53.08 | Hopper cars — open top special service | 21 | L3 |
| 53.09 | Refrigerator — nonmechanical | 18 | L4 |
| 53.15 | All other cars | 21 | L3 |
| 53.16 | Cabooses | 15 | L2 |
| 53.20 | All flatcars: | 34 | L0 |
|       | 53.11 Flat — TOFC/COFC | | |
|       | 53.12 Flat — multi-level | | |
|       | 53.13 Flat — general service | | |
| 53.30 | All gondolas: | 15 | L3 |
|       | 53.04 Gondolas — plain | | |
|       | 53.05 Gondolas — equipped | | |

The November 7, 1983, depreciation rate study covering the railroad equipment of Railway and L&A through the year 1981 shows the actual average age at retirement (by retirement year) for the designated railroad equipment as on pages 538-540:

Using the income-forecast method, petitioner claimed depreciation on its corporation income tax returns for the taxable years 1970 through 1975 in the following amounts based upon the following amounts of rental income:

| Year | Depreciation | Rental income |
|------|--------------|---------------|
| 1970 | $2,509,261.05 | $3,252,061.41 |
| 1971 | 2,320,143.02 | 3,049,639.10 |
| 1972 | 1,999,637.26 | 2,680,610.27 |
| 1973 | 1,858,685.58 | 2,499,791.31 |
| 1974 | 1,771,482.89 | 2,365,802.21 |
| 1975 | 1,582,864.74 | 2,126,800.71 |

Respondent, in the statutory notice of deficiency, determined (1) that certain leases of equipment to affiliated members of Kansas City Southern Industries, Inc., were considered to be sales; (2) that lease contracts 041869 and 32370 with Gulf Oil Co. were considered to be sales; and (3) that the method of computing depreciation on *general leases*

was changed from the income-forecast method to the double-declining-balance method. To reflect these determinations respondent, in the notice of deficiency, reduced petitioner's income for each of the years in issue in the amounts of the reported rentals from the so-called affiliated leases and the Gulf leases and, correspondingly, disallowed the following amounts of depreciation deductions with respect to the designated leases in the taxable years 1970 through 1975:

| Year | Affiliated leases | Gulf leases | General leases | Total amount disallowance |
|------|-------------------|-------------|----------------|---------------------------|
| 1970 | $2,366,988.90 | $33,859.99 | $16,275.30 | $2,417,124.19 |
| 1971 | 2,144,242.32 | 43,967.76 | 19,149.17 | 2,207,359.25 |
| 1972 | 1,820,583.77 | 43,968.12 | 9,096.68 | 1,873,648.57 |
| 1973 | 1,695,054.77 | 43,968.12 | 2,796.03 | 1,741,818.92 |
| 1974 | 1,610,927.18 | 33,786.64 | 4,977.30 | 1,649,691.12 |
| 1975 | 1,470,178.88 | 10,068.54 | 16,339.99 | 1,463,907.43 |

In the amendment to petition, the petitioner alleged in the alternative in subparagraph (a)(8) that:

in the event that it is determined that the method used by petitioner to compute depreciation with respect to its leased property does not produce a reasonable allowance for depreciation with respect to any or all classes of equipment, then respondent erroneously failed to determine that petitioner is entitled to use the double-declining balance method of depreciation with an appropriate change to the straight-line method of depreciation under section 167(b) with respect to said equipment * * *

Respondent, in his answer to amendment to petition, conceded the lease versus sale issue. Concomitant with the recharacterization of petitioner's income from sales income to rental income, respondent allowed the following amounts of depreciation with respect to the taxable years in issue relating to leased equipment which respondent had previously treated as sales:

| Year | For assets at yearend | For assets sold during year | Total allowed |
|------|-----------------------|-----------------------------|---------------|
| 1970 | $791,980 | $4,458 | $796,438 |
| 1971 | 856,635 | 18,531 | 875,166 |
| 1972 | 1,053,879 | 32,040 | 1,085,919 |
| 1973 | 1,126,706 | 19,953 | 1,146,659 |
| 1974 | 1,125,856 | 2,690 | 1,128,546 |
| 1975 | 924,140 | 12,412 | 936,552 |

538

| Years | Yard locomotives class 52.01 Average age (years) | Road locomotives class 52.02 Average age (years) | Box plain 40 feet class 53.01 Average age (years) | Box plain 50 feet class 53.02 Average age (years) | Box equipped class 53.03 Average age (years) |
|---|---|---|---|---|---|
| 1964 | 27.50 | 21.02 | 30.34 | 22.38 | [1]N/R |
| 1965 | 18.83 | [1]N/R | 19.43 | 20.79 | 1.49 |
| 1966 | 27.94 | 14.80 | 19.35 | 9.50 | 4.41 |
| 1967 | [1]N/R | 24.50 | 19.59 | 8.04 | 8.94 |
| 1968 | 18.23 | 19.57 | 18.81 | 15.66 | 4.28 |
| 1969 | 30.50 | 21.50 | 28.57 | 20.83 | 5.59 |
| 1970 | [1]N/R | 18.20 | 23.45 | 19.66 | 6.77 |
| 1971 | 30.50 | 21.31 | 21.05 | 10.33 | 7.90 |
| 1972 | 24.74 | 23.65 | 19.38 | 15.32 | 9.28 |
| 1973 | [1]N/R | 23.58 | 16.96 | 16.49 | 7.54 |
| 1974 | [1]N/R | 24.47 | 18.77 | 11.37 | 10.29 |
| 1975 | [1]N/R | [1]N/R | 15.75 | 10.48 | 13.05 |

/R = No retirement.

| Years | Gondolas class 53.30[1] Average age (years) | Hopper-covered class 53.06 Average age (years) | Hopper open-top general service class 53.07 Average age (years) | Open-top hopper special service class 53.08 Average age (years) | Refrigerator nonmechanical class 53.09 Average age (years) |
|---|---|---|---|---|---|
| 1964 | 15.43 | 18.61 | 14.99 | [2]N/R | [2]N/R |
| 1965 | 17.01 | 19.92 | 12.50 | [2]N/R | [2]N/R |
| 1966 | 16.48 | 18.74 | 13.46 | [2]N/R | [2]N/R |
| 1967 | 16.73 | 18.40 | 14.31 | [2]N/R | [2]N/R |
| 1968 | 18.02 | 17.22 | 14.83 | 1.83 | [2]N/R |
| 1969 | 14.90 | 6.94 | 32.50 | [2]N/R | [2]N/R |
| 1970 | 18.98 | 16.19 | 10.51 | [2]N/R | [2]N/R |
| 1971 | 17.18 | 7.67 | 8.22 | 4.50 | 7.40 |
| 1972 | 17.59 | 17.70 | 9.59 | 9.50 | 9.73 |
| 1973 | 17.47 | 14.79 | 10.50 | [2]N/R | [2]N/R |
| 1974 | 13.26 | 14.35 | 11.37 | 11.50 | [2]N/R |
| 1975 | 13.40 | 13.94 | 10.78 | [2]N/R | [2]N/R |

[1]Contains sub-accounts: 53.04 and 53.05.
[2]No retirements.

| Years | All flatcars class 2053.20[1] Average age (years) | All other cars class 53.15 Average age (years) | Cabooses class 53.16 Average age (years) |
|---|---|---|---|
| 1964 | 6.26 | 36.08 | 36.90 |
| 1965 | 6.44 | 27.18 | 18.07 |
| 1966 | 38.50 | 25.37 | 21.28 |
| 1967 | 4.50 | 22.94 | 36.64 |
| 1968 | 6.50 | 36.68 | 31.23 |
| 1969 | [2]N/R | 41.77 | [2]N/R |
| 1970 | 16.50 | 27.62 | 28.40 |
| 1971 | [2]N/R | 19.51 | 6.50 |
| 1972 | 9.50 | 21.93 | 11.78 |
| 1973 | 13.33 | 20.22 | 8.50 |
| 1974 | 14.46 | 24.79 | 9.50 |
| 1975 | 11.78 | 21.60 | 25.50 |

[1]Contains sub-accounts: 53.11, 53.12, 53.13, and 53.14.
[2]No retirements.

relating to leased equipment which respondent had previously treated as sales:

| Year | For assets at yearend | For assets sold during year | Total allowed |
|------|------|------|------|
| 1970 | $791,980 | $4,458 | $796,438 |
| 1971 | 856,635 | 18,531 | 875,166 |
| 1972 | 1,053,879 | 32,040 | 1,085,919 |
| 1973 | 1,126,706 | 19,953 | 1,146,659 |
| 1974 | 1,125,856 | 2,690 | 1,128,546 |
| 1975 | 924,140 | 12,412 | 936,552 |

To reflect the concession of the lease versus sale issue and the allowance of the above amounts of depreciation on leased equipment, respondent recomputed the deficiencies in petitioner's corporation income tax for the taxable years 1970 through 1975 as follows:

| Year | Original deficiency | Increase | Increased deficiency |
|------|------|------|------|
| 1970 | $24,624 | $866,710 | $891,334 |
| 1971 | 41,799 | 574,652 | 616,461 |
| 1972 | 25,140 | 289,158 | 314,298 |
| 1973 | 107,820 | (27,737) | 80,083 |
| 1974 | 41,582 | 141,992 | 183,574 |
| 1975 | 27,819 | 56,750 | 84,569 |
| Total | 268,784 | 1,901,525 | 2,170,319 |

## OPINION

We must, as a preliminary matter, decide which party has the burden of proof with respect to the issue of the appropriateness of the income-forecast method of depreciation used by petitioner with respect to its leased equipment.

Respondent, in the statutory notice of deficiency, determined that certain leases of equipment (predominately to affiliated members of Kansas City Southern Industries, Inc.) were in actuality sales. Accordingly, respondent reduced petitioner's income for each of the years 1970 through 1975 in the amounts of the reported rentals and, correspondingly, disallowed the depreciation deductions claimed by petitioner under the income-forecast method with respect to the equipment covered by the designated leases. Respondent, in his answer to petitioner's amendment to petition, has now conceded the lease versus sale issue. However, respondent reduced the depreciation deduction

originally claimed by petitioner with respect to the equipment covered by said lease agreements. As a result of these adjustments flowing from his concession of the lease versus sale issue, respondent asserted increases in petitioner's corporation income tax deficiencies for the taxable years 1970 through 1975 in the total amount of $1,901,525, or total increased deficiencies for said years in the amount of $2,170,309.

Petitioner argues that in view of the increased deficiencies thus asserted by respondent, the burden of proof with respect to the issue of the reasonableness of the depreciation claimed by petitioner under the income-forecast method of depreciation of the leased equipment shifts to respondent. We agree. Rule 142(a), Tax Court Rules of Practice and Procedure, explicitly provides that the burden of proof shall be upon the petitioner "except that, in respect of any new matters, increases in deficiency, and affirmative defenses, pleaded in his answer, it shall be upon the respondent."[3] In *Achiro v. Commissioner*, 77 T.C. 881, 890 (1981), we delineated the circumstances requiring the shifting of the burden of proof to respondent:

> The assertion of a new theory which merely clarifies or develops the original determination without being inconsistent or increasing the amount of the deficiency is not a new matter requiring the shifting of the burden of proof. However, if the assertion in the amended answer either alters the original deficiency or requires the presentation of different evidence, then respondent has introduced a new matter. * * * [Citations omitted.]

Here, as a result of the assertion by respondent in his answer to the amendment to the petition that the income-forecast method is not an allowable method of depreciation for the leased equipment here at issue, respondent asserted an increase in total deficiencies for the taxable years 1970 through 1975 in the amount of $1,901,525. Under these circumstances, we conclude that the burden of proof with respect to the appropriateness of the income-forecast method of depreciation in this factual context has shifted to the respondent.

---

[3] We believe that the increased deficiencies asserted by respondent in his answer to amendment to petition fall within the ambit of Rule 142(a).

Petitioner was incorporated in 1964 and during the years 1970 through 1975, its majority stockholder was Veals, Inc., a member of the Kansas City Southern Industries, Inc., consolidated group. Since 1964, petitioner was engaged in leasing various categories of equipment which included railroad rolling stock, railway roadway maintenance equipment, aviation, communication, and other miscellaneous equipment. Many of the lease agreements executed by petitioner from 1964 through 1975 and covering a wide variety of equipment were with Kansas City Southern Railway Co. (Railway) and Louisiana & Arkansas Railway Co. (L&A). Substantially all of the leases for railroad equipment were 5-year primary terms with three 1-year renewal options, and substantially all of the leases for automotive equipment were 3-year primary terms with five 1-year renewal options.[4] Since its incorporation in 1964, petitioner used the income-forecast method of depreciation to compute the depreciation deduction for its leased assets. The annual depreciation of an asset was determined by multiplying the cost of such leased asset by a fraction, the numerator of which was the rental income received with respect to such asset for the taxable year, and the denominator of which was the total rental income anticipated over the primary term and the stated renewal periods under the leases. Respondent contests the applicability of the income-forecast method to compute allowable annual depreciation under the statute for the particular assets here involved.

Section 167(a) allows as a depreciation deduction a reasonable allowance for the exhaustion and wear and tear of property used in a trade or business or held for the production of income. Section 167(b) enumerates certain time-based methods of depreciation which may be employed to determine the reasonable allowance contemplated by the statute and further provides that the subsection shall not

---

[4]In *Kansas City Southern Railway v. Commissioner*, 76 T.C. 1067 (1981), which involved taxable years prior to 1970, we concluded that the written agreements between Carland, Inc., and certain designated lessees (including Railway and L&A) were valid lease agreements (rather than deferred payment purchase agreements) and that consequently the rentals paid by the lessees to Carland, Inc., pursuant to such agreements constituted rental payments deductible under sec. 162(a)(3).

be construed as a limitation on any depreciation allowance otherwise allowable under subsection 167(a).[5]

> it is the primary purpose of depreciation accounting to further the integrity of periodic income statements by making a meaningful allocation of the cost entailed in the use (excluding maintenance expense) of the asset to the periods to which it contributes. * * * [*Massey Motors, Inc. v. United States*, 364 U.S. 92, 104 (1960).]

In 1960 respondent, recognizing the inadequacy of the time-based methods of depreciation described in section 167(b) when applied to television films with their characteristically uneven flow of income, promulgated Rev. Rul. 60-358, 1960-2 C.B. 68, to permit the use of the income-forecast method of computing depreciation on the ground that the usefulness of a television film in a taxpayer's trade or business is more accurately measured over the stream of income it produces than over the passage of time above. The ruling explicitly states that the income-forecast principle was "limited in its application to television films, taped shows for reproduction and other property of a similar character." In Rev. Rul. 64-273, 1964-2 C.B. 62, respondent authorized the use of the income-forecast method with respect to motion picture films. The application of the income-forecast method has been approved by this Court in several cases, all of which involved films. *Abramson v. Commissioner*, 86 T.C. 360 (1986); *Greene v. Commissioner*, 81 T.C. 132 (1983); *Wildman v. Commissioner*, 78 T.C. 943 (1982); *Siegel v. Commissioner*, 78 T.C. 659 (1982); *Schneider v. Commissioner*, 65 T.C. 18 (1975).

---

[5]Sec. 167(b) provides as follows:

SEC. 167(b). USE OF CERTAIN METHODS AND RATES. For taxable years ending after December 31, 1953, the term "reasonable allowance" as used in subsection (a) shall include (but shall not be limited to) an allowance computed in accordance with regulations prescribed by the Secretary or his delegate, under any of the following methods:

> (1) the straight line method,
> (2) the declining balance method, using a rate not exceeding twice the rate which would have been used had the annual allowance been computed under the method described in paragraph (1),
> (3) the sum of the year-digits method, and
> (4) any other consistent method productive of an annual allowance which, when added to all allowances for the period commencing with the taxpayer's use of the property and including the taxable year, does not, during the first two-thirds of the useful life of the property, exceed the total of such allowances which would have been used had such allowances been computed under the method described in paragraph (2).

Nothing in this subsection shall be construed to limit or reduce an allowance otherwise allowable under subsection (a).

It is readily apparent that the income-forecast method authorized by the 1960 ruling was tailored to meet the perceived inadequacies of the time-based methods of depreciation outlined in section 167(b) which, when applied to a unique category of property (film), resulted in distortions of income.[6] Here, we are concerned with the determination of a reasonable allowance for depreciation under section 167(a) for assets such as railroad rolling stock of various categories, automotive equipment, aircraft, railroad maintenance-of-way equipment, and data processing equipment. The attributes inherent in a film property which made the traditional useful life concepts inapplicable simply do not apply to the categories of assets which concern us here. The usefulness of such assets is, in our view, adequately measured by the passage of time and we perceive no conceivable justification whatever for turning to the income-forecast method which keys the useful life of the asset to the income produced. We reject petitioner's argument that the inappropriateness of the income-forecast method of determining a reasonable allowance for depreciation would somehow be cured if, instead of depreciating the entire cost of the assets over the lease terms, the salvage value of the leased assets is considered as part of the equation. The introduction of a salvage value into the equation would do nothing to ameliorate the inherent inadequacies of the income-forecast method as applied to the leased assets here at issue.

Nor do we believe that the testimony of petitioner's expert witness, Dr. LaVern Krueger,[7] convincingly portrays the appropriateness of the use here of the income-forecast method. Dr. Krueger's opinion that the income-forecast method of depreciation, as applied by petitioner, was an acceptable method of depreciation seems to be based largely

---

[6]The ruling contains the following explanation:

"This distortion [of income] is caused by a strikingly uneven flow of income, earned by groups of programs within the series, resulting from contract restrictions, methods of distribution and audience appeal of the programs. If the film series is a success, additional income will be forthcoming from reruns over a period of years, depending upon its popularity; whereas, unsuccessful film series may produce little or no income after the initial exhibition. Thus the usefulness of such assets in the taxpayer's trade or business is measurable over the income it produces and cannot be adequately measured by the passage of time alone. * * * [Rev. Rul. 60-358, 1960-2 C.B. at 68.]"

[7]Dr. Krueger is a member of the faculty of the University of Missouri where, since 1970, he has taught a full range of accounting courses.

upon his view that such method satisfies the matching principle, i.e., the matching of costs and earnings, a generally accepted accounting concept. Dr. Krueger assumed, incorrectly we believe, that the lease terms represented the entire economic life of each group of assets here involved.[8] For depreciation purposes, however, the useful life of an asset is that period for which an asset may reasonably be expected to be employed in the taxpayer's business. *Massey Motors, Inc. v. United States, supra*; see also sec. 1.167(a)-1(b), Income Tax Regs. The determination of useful life is a question of fact (*Matson Navigation Co. v. Commissioner*, 67 T.C. 938, 944 (1977)), and there is nothing in the record to support the notion that the primary lease terms for the leased assets and their economic useful lives in petitioner's business operations were one and the same. Petitioner points out on brief that the equipment it owned and leased to others during the taxable years here in issue consisted of approximately 779 individual items covering a broad array of tangible personal property. There is no justification whatever for assuming that the useful lives of such items of property, with widely divergent characteristics, is automatically equal to the generally uniform lease terms here involved.

Moreover, in computing depreciation under the income-forecast method, petitioner failed to take into account any salvage value for the leased assets on the apparent ground that such salvage value was, in all instances, less than 10 percent of cost and hence could be disregarded. See sec. 167(f).[9] The regulations provide, with some exceptions, that salvage value must be taken into account in determining the depreciation deduction and that in no event shall an asset be depreciated below a reasonable salvage value. Sec.

---

[8]In fact, the expert witness indicated in his report that he considered the *primary* lease term to be the economic useful life of the leased equipment, a misconception that would necessarily vitiate his conclusions as the appropriateness of the income-forecast method.

[9]In *Kansas City Southern Railway v. Commissioner*, 76 T.C. 1067, 1097 (1981), the Court noted in footnote 16 that during the years 1965 through 1974, Carland received approximately 26 percent of the original cost from the sale of equipment previously subject to its leases with various lessees. We recognize, of course, that the question presented in the cited case, whether amounts paid or accrued to Carland in years prior to 1970 by the lessees Railway and L&A were deductible as rental payments under sec. 162(a)(3), is not present here. In the instant case, the issue of the proper tax treatment by Carland of the payments it received in the years 1970-75 under the written lease agreements, i.e., whether Carland correctly included such payments as rental income, has been conceded by respondent.

1.167(a)-1(c)(1), Income Tax Regs. The cited regulations define salvage value as:

the amount (determined at the time of acquisition) which is estimated will be realizable upon sale or other disposition of an asset when it is no longer useful in the taxpayer's trade or business or in the production of his income and is to be retired from service by the taxpayer. * * *

An important factor in the determination of salvage value is the taxpayer's experience and the particular circumstances of that experience. Industry experience is also a factor which may be given consideration. *Engineers Limited Pipeline Co. v. Commissioner*, 44 T.C. 226, 230-231 (1965).

We have carefully considered the record with respect to the salvage value of the various categories of leased assets here involved. The evidence includes detailed records showing the amounts realized by petitioner from the disposition of its leased assets in all categories over a period of 20 years (1964-84). We have also considered the actual experience of Kansas City Southern Railway and Louisiana & Arkansas Railway with respect to salvage values. In our determination of salvage value we have adhered to the categories of leased assets as developed by the evidence. Moreover, in our findings of salvage value we have rejected petitioner's contention that the actual salvage values as demonstrated by the evidence should be adjusted to reflect inflationary price levels. The regulations make it abundantly clear that salvage values must be determined at the time of acquisition of the assets and that such "Salvage value shall not be changed at any time after the determination made at the time of acquisition merely because of changes in price levels." Sec. 1.167(a)-1(c)(1), Income Tax Regs. We conclude, based upon the entire record, that the salvage values (stated in terms of a percentage of original acquisition costs) of the leased assets were as follows: transportation equipment (categories 110-140), 8 percent; transportation equipment (category 150), 25 percent; rolling stock (categories 210-260), 15 percent; maintenance-of-way equipment (categories 310-340), 7 percent; data processing equipment (category 400), 15 percent; aircraft and components (categories 510, 519), 50 percent; and other equipment designated as category 500-509, 14 percent.

Petitioner's effort to now rely upon the class life asset depreciation range system as a measure of the reasonableness of its claimed depreciation allowance (see sec. 167(b)(4)) must be rejected. It will suffice to say that any election to adopt the class life asset depreciation range system must be made within the time prescribed by statute for filing the tax return for the year of election. Sec. 1.167(a)-1(f), Income Tax Regs. Petitioner argues that the purported similarity between the useful lives of the leased assets and the period over which they were depreciated (i.e., the lease terms) under the income-forecast method supports the reasonableness of the depreciation claimed during the taxable years before us, at least with respect to some of the hundreds of items of property here involved. In view of the marked inappropriateness and unreliability of the income-forecast method to measure the depreciation allowance under section 167(a) for the type of assets here involved, we see no validity in petitioner's effort to salvage the method with respect to a selected few of its assets on a piecemeal basis.

We turn next to a consideration of the useful lives to be assigned to the groups of leased assets here at issue as a necessary step in the determination of a reasonable allowance for depreciation of such assets under the provisions of section 167(a). Petitioner raised this alternative issue with respect to the useful lives of the various categories of assets by way of an amendment to its petition filed with the Court on August 28, 1985, shortly before the commencement of the trial of this case on October 21, 1985. Both parties have presented evidence with respect to the useful lives of the leased assets here involved.[10] It would serve no useful

---

[10]The leased assets were considered under general classifications:

| | Class No.— |
|---|---|
| A. Transportation equipment: | |
| Passenger auto | 110, 119 |
| Light trucks — under 1 ton | 120, 129 |
| Medium trucks — 1 to 2 tons | 130 |
| Heavy trucks — over 2 tons | 140, 149 |
| Trailers, vans, flatbeds | 150 |
| B. Rolling stock: | |
| Rolling stock, complete units | 210, 219 |
| Components, traction motors | 220 |
| Components, engine | 230 |
| Components, generator | 240, 249 |
| Components, auto-racks | 250 |
| Components, other | 260 |
| C. Maintenance-of-way equipment: | |
| Cranes — large | 310 |
| Cranes — small | 320 |

purpose to discuss in exhaustive detail the testimony of the numerous witnesses who offered their opinions on the various statistical computations which are in evidence. The determination of useful life is a question of fact. *Merchants Nat. Bank of Topeka v. Commissioner*, 554 F.2d 412, 415 (10th Cir. 1977), affg. a Memorandum Opinion of this Court. Such determination must be based on facts that were known or could reasonably have been anticipated at the time the returns were filed for the years in issue. *New England Tank Industries, Inc.*, 50 T.C. 771, 781 (1986), affd. per curiam 413 F.2d 1038 (1st Cir. 1969); *Casey v. Commissioner*, 38 T.C. 357, 381 (1962). Respondent's regulations provide guidelines for the determination of the useful life of an asset:

(b) *Useful life.* For the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. Some of the factors to be considered in determining this period are (1) wear and tear and decay or decline from natural causes, (2) the normal progress of the art, economic changes, inventions and current developments within the industry and the taxpayer's trade or business, (3) the climatic and other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals, and replacements. Salvage value is not a factor for the purpose of determining useful life. If the taxpayer's experience is inadequate, the general experience in the industry may be used until such time as the taxpayer's own experience forms an adequate basis for making the determination. The estimated remaining useful life may be subject to modification by reason of conditions known to exist at the end of the taxable year and shall be redetermined when necessary regardless of the method of computing depreciation. However, estimated remaining useful life shall be redetermined only when the change in the useful life is significant and there is a clear and convincing basis for the redetermination. * * * [Sec. 1.167(a)-1(b), Income Tax Regs.]

| | |
|---|---|
| Ballast working machines | 330 |
| Other equipment | 340, 349 |
| D. Data processing | 400 |
| E. Other equipment | 500, 509 |
| F. Aircraft and components | 510, 519 |

We have carefully considered the extensive evidence submitted by the parties with respect to the useful lives of the various categories of leased assets. We are not bound by expert testimony which is contrary to our judgment; (*Kreis' Estate v. Commissioner*, 227 F.2d 753, 755 (6th Cir. 1955)), affg. a Memorandum Opinion of this Court, and we may reject expert testimony when in our judgment it is appropriate to do so. *Helvering v. National Grocery Co.*, 304 U.S. 282 (1938); *Chiu v. Commissioner*, 84 T.C. 722, 734 (1985). Moreover, the testimony of expert witnesses must be evaluated in light of the entire record in a particular case. Nor are we bound to accept general testimony at full value, even when it is uncontroverted, if it is unreasonable or questionable (*Commissioner v. Smith*, 285 F.2d 91, 96 (5th Cir. 1960)), affg. a Memorandum Opinion of this Court, or when the facts in their totality convey a different impression. *Diamond Bros. Co. v. Commissioner*, 322 F.2d 725 (3d Cir. 1963), affg. a Memorandum Opinion of this Court.

Respondent does not contest the 4-year useful life claimed by petitioner on brief for passenger automobiles (class number 110). We have considered the testimony of the several witnesses with respect to the useful lives of petitioner's transportation equipment: light trucks, medium trucks, heavy trucks, and trailers, vans, and flatbeds. (Class numbers 120, 130, 140, and 150, respectively). Petitioner's expert witness, Mr. Cormier, prepared a detailed analysis of petitioner's assets, including categories 120, 130, 140, and 150, based upon a computerized data base. [11] Mr. Dehner, who was employed as assistant to the president of Carland from July 1973 to March 1975, testified in conclusory terms as to useful lives of the transportation equipment. Mr. Curtis, chief engineer of capital projects for Kansas City Southern Railroad, testified knowledgeably as to the conditions under which the transportation equipment was used and also indicated the degree of use for such equipment. Mr. Martin, who since 1969 served as vice president and

[11]The data indicated, with respect to each asset, the category of asset, the date the asset was placed in service, the original cost of the asset, and the date the asset was retired. Mr. Cormier employed actuarial retirement rate methodology to analyze this data and to determine the useful lives experienced for the various groups of assets.

general manager of Kansas City Southern Transport Co.,[12] testified in detail as to the uses and maintenance policies for some of the transportation equipment at issue. It would be futile to attempt a reconciliation of the divergent testimony given by all of the witnesses with respect to the useful lives of the assets. Some of the witnesses displayed an erroneous notion of the concept of useful lives for depreciation purposes. We have, inter alia, considered the actual retirement data for petitioner's transportation equipment. We have carefully considered the entire record and we conclude that the average useful lives of the several categories of petitioner's transportation equipment are as follows: class 120 (light trucks), 5 years; class 130 (medium trucks), 7 years; class 140 (heavy trucks), 8 years; class 150 (trailers, vans, flatbeds), 12 years.

Maintenance-of-way equipment includes a broad range of equipment including large cranes (class 310), small cranes (class 320), ballast working machines (class 330), and a miscellany of other related equipment (class 340). Maintenance-of-way equipment is comprised of those machines used to maintain and construct the track system, as well as to maintain the bridges and signals that made up the system. The tools and devices included in classes 330 and 340 are diverse and uniquely adapted for special jobs encountered in maintenance-of-way work. Mr. Curtis testified generally as to the useful lives of items in these classes of property. While he was undoubtedly closely familiar with the various aspects of the maintenance-of-way work done in connection with the Kansas City Southern Railway system over a period of many years, we find his estimates of the various classes of maintenance-of-way equipment unrealistic when viewed against the detailed historical data showing the acquisition dates and the retirement dates of such Carland-owned equipment on an item by item basis over the period 1964-84. The usefulness of such historical data in gauging the useful life of an item of equipment is apparent. We realize, of course, that the absence of a retirement date in the historical data is not conclusive as to the continued

---

[12]Kansas City Southern Transport, a subsidiary of Railway, operated the major terminals of Railway and L&A. During the years 1970 to 1975, Kansas City Southern Transport leased transportation equipment from Carland.

use of a particular item of equipment. As the record suggests, maintenance-of-way equipment that is no longer serviceable may simply be abandoned or scrapped with no record made of any specific retirement date. We have carefully considered the entire record and we conclude that the average useful lives of the several categories of maintenance-of-way equipment are as follows: class 310 (large cranes), 15 years; class 320 (small cranes), 10 years; class 330 (ballast working machines) 10 years; class 340 (other general equipment), 10 years.

The data processing equipment (class 400) leased by Carland included central processing units, key punch terminals, printers, memory units, modems, and automatic car identification (ACI) scanner systems, and related railcar wheel sensors. Petitioner highlights the difficulties encountered in the operation of the scanner systems which made it necessary to abandon them in 2 or 3 years after installation. It appears that the operational problems were unforeseen. Mr. Taylor, an employee of the company that installed and maintained electronic equipment for Railway and L&A, testified that, absent such problems, the system would have been kept in operation for a longer period of time. Mr. Taylor also testified that the scanners had a useful life of some 5 to 7 years. Mr. Pattison, employed by Railway as manager of computer operations, testified with respect to the frequent technological changes in the computer industry which made it necessary to replace equipment. He stated his belief that changes in technology as well as the cost of the newer technology influenced the useful life of such equipment. Based upon these considerations, he estimated the useful life of computer equipment generally was 5 years. Yet he admitted that it was extremely difficult to forecast the changes in technology and the rate of such changes. Moreover, he testified that some leased computers had been in service for as long as 15 years. We have also considered the historical data in the record showing actual service lives for various items of computer equipment ranging from 8 to nearly 10 years. Upon consideration of the entire record we conclude that the average useful life of the equipment in this category (class 400) is 10 years.

A category designated as "other equipment" (class 500) appears to be a catch-all category which includes a miscellany of items such as furniture and fixtures, cameras, recorders, communications equipment, generators, compressors, backhoes, and forklifts. The evidence with respect to the multitude of items in this category is understandably sketchy. Mr. Taylor testified the useful life of locomotive radios, mobile radios, and base station radios was uniformly 10 to 12 years, while hand-held radios had a useful life of 5 to 6 years. He also estimated the useful life of electronic scales to be 10 to 15 years. The historical retirement data for petitioner's leased assets over the period 1964-84 shows that a significant number of items in class 500 were kept in service for 10 years or more. On this record, we conclude that the average useful lives for the equipment included in class 500 was 10 years.

Class 510 consists of the category described as "aircraft and components." It appears that petitioner leased aircraft for a relatively short space of years before disposing of the assets in this category. Mr. Cormier determined under the actuarial method that the useful life of the assets in this category was in the 2½- to 4-year range. The historical data pertaining to these assets shows that they were acquired in stages beginning in 1967 and were then sold during the years 1968-71. In gauging the useful life of these assets we believe it is of some significance that the so-called salvage proceeds for these assets represented about 54 percent of the original acquisition costs. We conclude on the basis of the entire record that the average useful life of the assets in class 510 was 4 years.

Petitioner's rolling stock is encompassed by classes 210 through 260 which include a wide variety of leased equipment including boxcars, flatcars, hopper cars, tank cars, gondolas, coaches, cabooses, locomotives and locomotive engines, traction motors, generators, and other miscellaneous items. The freight cars alone number in the hundreds and are employed in the transportation of various categories of freight under diverse conditions. The paucity of historical data as to some type of freight cars and the perfunctory evidence with respect to the useful lives of some of the rolling stock here involved makes it imperative, in our view,

to consider this multitude of assets as a whole for the purpose of determining a useful life. Significantly, petitioner's expert witness, Mr. Cormier, similarly considered all of petitioner's rolling stock (freight cars and locomotives) as a group in his analysis of the useful life of such equipment. In our consideration of the useful lives of the equipment in this category, we have taken into account the evidence that most of the freight cars were rebuilt and then placed in service.

Respondent's expert witness, Mr. Charles L. Carroll, relied upon a report containing historical data relating to the salvage value and age of the locomotive and freight cars based upon information filed with the Interstate Commerce Commission showing the actual historical experience of Kansas City Southern Railway and Louisiana & Arkansas Railway. Respondent also produced evidence of two depreciation studies prepared by Kansas City Southern Railway and Louisiana & Arkansas Railway concerning all of their rolling stock. The first study covered equipment accounts through the year 1981, the other through the year 1984. The depreciation studies were based on the aged equipment data (by sub-account) which was run through an actuarial program providing data points for plotting survivor curves. The survivor curves were then generated by computer but were manually fitted to Iowa curves. As part of the study, a 30-year experience band was analyzed and included all types of installations as well as all types of retirements in all cases. The depreciation studies were submitted to the Interstate Commerce Commission by Kansas City Southern Railway and Louisiana & Arkansas Railway to justify proposed depreciation rates.

The historical aged equipment data which appears in the above studies is clearly pertinent to the issue before the Court. The useful life of an asset for purposes of section 167(c) may be determined by reference to a taxpayer's own experience with similar property taking into account present conditions and probable future developments. Sec. 1.167(a)-1(b), Income Tax Regs. Significantly, the regulations go on to state that "If the taxpayer's experience is inadequate, the general experience in the industry may be used until such time as the taxpayer's own experience forms an

adequate basis for making the determinations." In considering such aged equipment data generated by Kansas City Southern Railway and Louisiana & Arkansas Railway in connection with proceedings before the Interstate Commerce Commission, we are mindful of the fact that the estimates of useful life based on such data and made in the context of rate-making proceedings before the Interstate Commerce Commission cannot automatically be treated as though they were estimates of useful life for tax purposes. See *Southern Pacific Transportation Co. v. Commissioner*, 75 T.C. 497, 670 (1980). However, the relevance and significance of such material developed in agency proceedings is indisputable. Cf. *Commissioner v. Idaho Power Co.*, 418 U.S. 1 (1974).[13] A further factor reinforcing the importance here of the depreciation studies prepared by Kansas City Southern Railway and Louisiana & Arkansas Railway is the fact that a substantial portion of petitioner's rolling stock was in fact leased to the two railway companies and presumably operated by them under conditions indistinguishable from their use of their own equipment.

The December 31, 1981, depreciation study prepared by Kansas City Southern Railway and Louisiana & Arkansas Railway was based on historical data for locomotives and freight cars and showed (1) average age at retirement by vintage year, (2) survivors and retirements by vintage year, (3) a 30-year band analysis survivor report, and (4) a stub curve graph which charted actual retirements. Using such historical data, the study showed the following average service lives based upon Iowa curve projections: yard locomotives, 36 years; road locomotives, 24 years; plain boxcars (40 ft.), 18 years; plain boxcars, (50 ft. and longer), 17 years; equipped boxcars, 15.5 years; covered hoppers, 22 years; open-top hoppers, general service, 13 years; open-top

---

[13]In the cited case, the issue was whether the taxpayer was entitled to deduct depreciation under sec. 167(a) on equipment used by taxpayer in the construction of its own capital facilities or whether the capitalization provisions of sec. 263 banned the deduction. The Supreme Court stated in relevant part as follows:

"Some, although not controlling, weight must be given to the fact that the Federal Power Commission and the Idaho Public Utilities Commission required the taxpayer to use accounting procedures that capitalized construction-related depreciation. Although agency-imposed compulsory accounting practices do not necessarily dictate tax consequences * * * they are not irrelevant and may be accorded some significance. * * * [*Commissioner v. Idaho Power Co., supra* at 14-15. Citation omitted.]"

hoppers, special service, 21 years; refrigerator cars (nonmechanical), 18 years; all other cars, 21 years; cabooses, 15 years; all flatcars, 34 years; and all gondolas, 15 years. The average service lives outlined above resulted from an analysis of a 30-year experience band charting the retirement experience of Railway rolling stock.

Petitioner's expert witness, Mr. Cormier, relied upon the actuarial retirement rate methodology to determine the useful life for rolling stock in the range of 8.75-13 years. The actuarial method purports to analyze the past retirement experience of depreciable assets for purposes of estimating the future service life of similar assets.[14] In *Chesapeake & Ohio Ry. Co. v. Commissioner*, 64 T.C. 352 (1975), the Court emphasized certain factors to be considered in a proper evaluation of the results reached under this method:

> The strength of the actuarial method lies in its consideration of both the number and age of not only past retirements but also the units remaining in service. However, because the results of the actuarial method reflect all retirements for whatever cause, it is essential that in evaluating those results one ascertain the cause of past retirements and apply judgment as to whether they may be expected to continue in the future. Moreover, the reliability of the results may be adversely affected by the small size of the groups of property observed, infrequent observations of the property, or the retirement of a relatively large number of units for a very special cause. * * * [*Chesapeake & Ohio Ry. Co. v. Commissioner, supra* at 374.]

Mr. Cormier's testimony readily reveals the shortcomings of the useful life study prepared by Valtec Associates, Inc. (Valtec). It appears that Valtec played no part in gathering the data or in classifying the hundreds of assets encompassed by the data base. No effort was made to place the various kinds of rolling stock in separate categories for purposes of making a more meaningful analysis. No effort was made to determine the causes for the retirement of the assets contained in the study and, consequently, it would be

---

[14]"The fundamental principle of the actuarial method is that groups of similar assets possess, on the average, similar service life characteristics. The goal of this statistical approach for determining the useful life of an asset is to generate a survivor curve for the particular asset and then to analyze that curve to determine that asset's useful life. Application of the actuarial method involves three phases: data gathering and mathematical calculations, life analysis, and life estimation. * * * [*Burlington Northern Inc. v. United States*, 230 Ct. Cl. 102, 106, 676 F.2d 566, 569 (1982).]"

impossible to apply informed judgment as to the expected continuation of such causes in the future. Moreover, the record shows that Valtec, in its study, failed to give proper attention to the presence of used assets in the data base which, of course, would have a material effect on the conclusions drawn from the study. Nor did Valtec consider any of the conditions under which the assets in question were used so as to exercise an informed judgment as to the likelihood that such conditions would continue to prevail. In short, the Valtec analysis was little more than a mechanical application of the actuarial method to a data base with no perceptible effort to observe the safeguards emphasized by this Court in prior cases which would augment the reliability of the results.[15]

We have also considered the testimony of Mr. Dehner, who was employed by Carland as assistant to the president from July 1973 to March 1975, and the testimony of Mr. Souter, who is employed by Kansas City Southern Railroad as superintendent of machinery. Both witnesses testified in broad general terms with respect to the perceived useful lives of the various categories of assets here involved. Apart from the bare recitation of the purported useful lives attributed to the various categories of leased assets, we are left essentially uninformed as to the underlying information relied upon by the witnesses in making such estimates.

We have carefully considered all of the evidence bearing upon the useful life of the rolling stock in these categories (210-260). Upon careful consideration of the record as a whole, with particular emphasis upon the voluminous historical data in evidence which we consider uniquely relevant, we conclude that the average useful life of the assets in the categories (predominately rolling stock) here under consideration is 20 years.

We have concluded that the income-forecast method of depreciation was an impermissible choice of method. Under the circumstances, we must agree with petitioner that it is now entitled to apply the double-declining-balance method under section 167(b) to compute a reasonable allowance for

---

[15]The computerized data base used by Valtec in its study was furnished by Kansas City Southern Industries, Inc. Mr. Cormier testified that the data base was received in mid-September, 1985.

depreciation in the years here at issue under section 167(a) for the various categories of its leased assets. See *Silver Queen Motel v. Commissioner*, 55 T.C. 1101 (1971).

*Decision will be entered under Rule 155.*